IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

EDWARD J. KING,

    Plaintiff,

  v.                                    Civil Action 2:15-cv-2225
                                        Judge George C. Smith
                                        Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Edward J. King, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED** and judgment be entered in favor of the Commissioner.

## I. BACKGROUND

**A.**    **Prior Proceedings**

Plaintiff filed his SSI application on June 28, 2011, alleging a disability onset date of June 1, 2008. (*See* Doc. 10 at Tr. 182, PAGEID #: 224; *id.* at Tr. 194, PAGEID #: 236 (amended onset date of June 28, 2011)). After an administrative hearing on October 31, 2013, the ALJ denied benefits on January 24, 2014. (*See id.* at Tr. 27, PAGEID #: 69). That became the Commissioner's final decision on March 30, 2015, when the Appeals Council denied review. Plaintiff now appeals. (*See* Doc. 10 (administrative record); Doc. 11 (statement of specific errors); Doc. 16 (memorandum in opposition); Doc. 17 (reply)).

B.     **Plaintiff's Testimony at the Administrative Hearing**

At the time of the administrative hearing, Plaintiff was 47 years old and lived in a mobile home with a roommate and his two dogs.  Much of his disability-related testimony concerned his back problems.  (*See* Doc. 10 at Tr. 41, PAGEID #: 83 ("It feels like something inside of me is just pulling me apart.  It feels like I'm ready to explode right about my waistline."); *id.* at Tr. 42–43, PAGEID #: 84–85 (Plaintiff testifying that his back "hurts constantly," with an average pain level of "[a]bout a three" and pain that goes up to "[a]bout a nine" roughly ten days a month)).

Relevant to this appeal, Plaintiff also testified about his mental limitations.  He repeated several grades and was 18 by the time he finished ninth grade, which was the last grade he completed in school.  (*See id.* at Tr. 39, PAGEID #: 81).  His roommate does his grocery shopping because Plaintiff "get[s] so confused when [he's] trying to keep track of things or trying to figure it in [his] head."  (*Id.* at Tr. 49–50, PAGEID #: 91–92).  Plaintiff started getting mental-health treatment in May of 2013 "[b]ecause I can't deal with people, and I was being mean to my kids, my roommate, my parents, anybody around me."  (*Id.* at Tr. 46, PAGEID #: 88).  He testified he would regularly "get violent, throw things, [and] hit things" and not realize it until afterward.  (*Id.*).  These fits affected his concentration (*see id.* at Tr. 49, PAGEID #: 91), and sometimes caused him to blackout (*see id.* at Tr. 50, PAGEID #: 92).  They also came on without much warning.  (*See id.* ("I can be fine one minute, get up, walk through the trailer, go to the bathroom and come back and be a regular idiot . . . . [I]t don't make a lick of sense.")).

C.     **The Medical Records**

Plaintiff's statement of errors concerns only his alleged borderline intellectual functioning ("BIF").  Relevant to that issue, his IQ was tested three times when he was in school, all with scores above 70—once in fourth grade (75), once in sixth grade (78), and once in 8th

grade (81).  Later in life, Plaintiff sought mental-health treatment at the Woodland Centers. Treatment notes from the Woodlands detail Plaintiff reporting he has a bad temper, sometimes blacks out, has a hard time remembering things, and often feels worthless.  (*See, e.g.*, Doc. 10 at Tr. 357–66, PAGEID #: 399–408).

Plaintiff also saw psychologist Brian Griffiths for a consultative examination.  Plaintiff described his academic performance as "not good" and told Mr. Griffiths he dropped out of high school after the ninth grade because he "couldn't deal with . . . being around big crowds of people."  (*Id.* at 327, PAGEID #: 369).  Mr. Griffiths asked Plaintiff to "perform serial sevens," to which Plaintiff replied, "100, I don't know."  (*Id.* at Tr. 330, PAGEID #: 372).  Plaintiff could not count backward from twenty by threes, could not calculate sixteen plus nine, and could not calculate one hundred minus twelve.  (*See id.*).  Mr. Griffiths remarked that Plaintiff's "general level of intelligence appeared to fall in the borderline range."  (*Id.*).

Mr. Griffiths further remarked that Plaintiff "was alert, responsive and oriented to time, place, person and situation."  (*Id.*).  Moreover, "[h]e was not confused," but "was aware of his past as well as his present situation" and "was able to provide personal historical information." (*Id.*).  Regarding his insight and judgment, Mr. Griffiths concluded Plaintiff could "manage himself in the community," "make decisions affecting his future," and "conduct his own living arrangements efficiently."  (*Id.*).

At the end of his report, Mr. Griffiths offered several conclusions as to Plaintiff's mental state and intellectual abilities.  He concluded, for example, that Plaintiff "appeared to be an intellectually limited person."  (*Id.*).  Mr. Griffiths continued:

> There appears to be sufficient evidence to support a diagnosis of Borderline Intellectual Functioning. . . .
>
> . . . .

3

> He was able to follow simple instructions during the evaluation. He performed marginally adequately on Digit Span, a simple structured task designed to assess short-term memory skills. This information suggests that he can remember and carry out basic work-related activities in a timely and consistent manner.

(*Id.*).

The record contains findings of at least two state-agency reviewers relevant to this appeal. Caroline Lewin, a state-agency reviewing psychologist, reviewed Plaintiff's treatment records and listed "Borderline Intellectual Functioning" (BIF) as one of Plaintiff's severe impairments. (*Id.* at Tr. 95, PAGEID #: 137). Frank Orosoz, Ph.D., also reviewed the record and concluded that Plaintiff has "[n]o mental medically determinable impairments." (*Id.* at Tr. 82, PAGEID #: 134).

**D.     The ALJ's Decision**

The ALJ found the following severe impairments: chronic obstructive pulmonary disease, degenerative disc disease, osteoarthritis, osteopenia, and bipolar disorder. (Doc. 10 at Tr. 15, PAGEID #: 57). The ALJ discussed Plaintiff's mental impairments and noted Mr. Griffiths' diagnosis of "mood disorder, NOS and panic disorder without agoraphobia." (*Id.* at Tr. 16, PAGEID #: 58). The ALJ further considered but found nonsevere Plaintiff's "hypertension, Vitamin D insufficiency, hypoglycemia, facial contusion abrasion of right eyebrow, fractured nose, closed head injury without loss of consciousness, and alcohol abuse in remission." (*Id.*). In considering Plaintiff's ailments, the ALJ did not mention BIF.

Next, the ALJ concluded Plaintiff's mental impairments did not meet the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In so doing, he considered the reports from Mr. Orosz and Ms. Lewin, as well as Plaintiff's treatment notes from the Woodlands. The ALJ remarked that Plaintiff "has moderate difficulties" "[w]ith regard to

4

concentration, persistence or pace." (*Id.* at Tr. 18, PAGEID #: 60). He noted Plaintiff's ability to pay bills, count change, and handle a savings account, but also pointed out Plaintiff's inability to use a checkbook, as well as with his problems with concentration and math. (*See id.* ("During the mental status examination, the claimant was unable to perform serial sevens or count backwards from twenty by threes." (citation omitted))).

At step four, the ALJ conducted an analysis of Plaintiff's residual functional capacity ("RFC") and concluded Plaintiff "could perform medium work." (*Id.* at Tr. 19, PAGEID #: 61). Throughout his analysis, he remarked on Plaintiff's mental capacity and mental issues. For example, he noted Plaintiff's difficulties, among others, in dealing with concentration, temper, and relationships with others. He discussed treatment notes from the Woodlands, which detailed Plaintiff's bouts with depression and anxiety. (*Id.* at Tr. 22, PAGEID #: 64). He cited the portion of the Woodlands notes reporting Plaintiff's capability of completing basic activities of daily living without issue. (*See id.* at Tr. 23, PAGEID #: 65). The ALJ also discussed Plaintiff's limitations that Mr. Griffiths identified in his report, as well as Ms. Lewin's opinion regarding Plaintiff's work-related capabilities and constraints. (*See id.* at Tr. 25, PAGEID #: 67). He gave Mr. Griffths' and Ms. Lewin's respective opinions great weight.

The ALJ finally concluded that there were jobs that exist in the national economy that Plaintiff could perform and therefore denied benefits. (*See id.* at Tr. 26–27, PAGEID #: 68–69).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. Nat'l Labor Relations Bd.*, 296 F.3d 384, 395 (6th Cir. 2002).

### III. DISCUSSION

On appeal, Plaintiff contends the ALJ's failure to consider his BIF at step two was not harmless because the RFC analysis did not account properly for any BIF-related limitations. He also contends the ALJ committed reversible error by failing to consider whether his BIF might meet or equal the listings at step three.

**A.  The ALJ's Failure to Consider Plaintiff's BIF at Step Two**

The Commissioner argues the ALJ's failure to consider whether Plaintiff's BIF qualified as a severe impairment at step two was harmless error. An ALJ's error in classifying an impairment as severe is harmless where the ALJ goes on to "consider[] all of plaintiff's impairments (both severe and non-severe) in determining plaintiff's RFC" and "properly account[s] for the limitations imposed by both." *Angelo v. Comm'r of Soc. Sec.*, No. 1:12-CV-169, 2013 WL 765646, at *6 (S.D. Ohio Feb. 28, 2013), *report and recommendation adopted*, No. 1:12-CV-00169, 2013 WL 1344841 (S.D. Ohio Apr. 2, 2013); *see Johnson v. Comm'r of Soc. Sec.*, No. 2:14-CV-306, 2015 WL 686298, at *5 (S.D. Ohio Feb. 18, 2015), *report and recommendation adopted sub nom. Johnson v. Colvin*, No. 2:14-CV-306, 2015 WL 1286536 (S.D. Ohio Mar. 18, 2015) (framing the issue as "whether any symptoms attributed to Plaintiff's

6

[impairment] were accommodated by the ALJ's residual functional capacity finding").

The ALJ met this standard. Despite his failure to mention expressly Plaintiff's BIF at step two, the ALJ's RFC analysis discussed the limitations attributable to Plaintiff's BIF. For example, the ALJ thoroughly summarized the opinions of Mr. Griffiths, the consultative examiner who diagnosed Plaintiff with BIF. Specifically, the ALJ discussed Mr. Griffiths' opinion that Plaintiff's "emotional problems would possibly interfere with his ability to pay attention and concentration and that his agitation, irritability, and poor frustration tolerance would negatively impact task persistence and pace." (Doc. 10 at Tr. 25, PAGEID #: 67). The ALJ then noted Mr. Griffiths' opinion that Plaintiff's intellectual and mental issues "would interfere with his ability to get along with co-workers, supervisors, and the general public" and, when combined with the "stress and pressures associated with day-to-day work activity," might "further negatively impact his workplace performance and relationships." (*Id.*).

At the conclusion of the RFC analysis, the ALJ also considered Ms. Lewin's opinion. As a state-agency reviewer, she completed a mental RFC form. The ALJ gave her opinion great weight and accounted for what Ms. Lewin considered the limitations associated with Plaintiff's mental-health and cognitive functioning:

> [Ms. Lewin] opined the claimant would be limited to simple, routine tasks in a structured environment; appeared capable of maintaining concentration for simple, routine task[s] with regular breaks; and would be limited to low stress, low production work in a relaxed setting and minimal to no routine changes.

(*Id.* at Tr. 25, PAGEID #: 67).

The ALJ then incorporated Mr. Griffiths' and Ms. Lewin's respective opinions about Plaintiff's limitations into his conclusion as to Plaintiff's RFC. Both reviewers concluded Plaintiff would do best with simple tasks in a low-stress environment with minimal interaction with others. That is exactly what the ALJ found as well when he concluded Plaintiff "is able to

7

perform simple routine tasks involving no more than simple, short instructions and simple work-related decisions with . . . no interaction with the general public, and only superficial interaction with co-workers and supervisors." (*Id.* at Tr. 19, PAGEID #: 61).

In short, the ALJ gave great weight to both reviewers who diagnosed Plaintiff's BIF and he incorporated their opinions as to Plaintiff's BIF-related limitations into his RFC analysis. For these reasons, the RFC analysis "considered all of plaintiff's impairments (both severe and non-severe)," including his BIF. *Angelo*, 2013 WL 765646, at *6. Any error in failing to categorize Plaintiff's BIF as severe was thus harmless.

Plaintiff counters that the ALJ's failure to give any consideration to the severity of Plaintiff's BIF at step two means the error was necessarily harmful. He cites two cases for support. The first, *Meadows v. Comm'r of Soc. Sec.*, No. 1:07-cv-1010, 2008 WL 4911243 (S.D. Ohio Nov. 13, 2008), undercuts his argument. The Court in *Meadows* addressed whether an ALJ's failure to "mention[] [a] plaintiff's impairment" in step two was in error. *Meadows*, 2008 WL 4911243, at *12. The Court endorsed the Sixth Circuit's harmless-error analysis and explained such an error could in fact be harmless (even if it was not there) "as long as the ALJ found at least one severe impairment, continued the sequential analysis, and ultimately addressed all of the claimant's impairments in determining his residual functional capacity." *Id.* at *13. That is what happened here. Even though the ALJ did not find Plaintiff's BIF severe, the ALJ provided a thorough account of the limitations posed by Plaintiff's BIF. He then incorporated those limitations into his RFC conclusion. According to *Meadows*, the ALJ's failure to consider Plaintiff's BIF was thus harmless.

Plaintiff also cites *Engel v. Comm'r of Soc. Sec.,* No. 1:13-CV-318, 2014 WL 1818187 (S.D. Ohio May 7, 2014). There, the Court held "[t]he ALJ's failure to make a severity

8

determination on [the] plaintiff's depression and PTSD [wa]s reversible error." *Id.* at \*6. Plaintiff argues *Engel* stands for the proposition that the failure to make a severity finding is reversible error by itself. A closer reading of *Engel* reveals a less clear conclusion. While Plaintiff's reading of *Engel* is one possibility, the Court in *Engel* also alluded that such an error might be harmless where the right amount of analysis or explanation allowed for meaningful review. *See, e.g.*, *id.* at \*5 ("Thus, the ALJ's minimal discussion of plaintiff's depression is not a substitution for a Step Two severity finding."). Again, this undercuts Plaintiff's argument that the ALJ's mistake in this case was necessarily harmful.

*Engel* is also distinguishable from this case in two key respects. First, despite acknowledging the standard harmless-error analysis, the Court in *Engel* declined to engage in the analysis because the Commissioner did not argue harmless error. *See id.* at \*6. Here, by contrast, the Commissioner explicitly argues that the ALJ's severity determination was harmless. Courts can and should engage in the harmless-error analysis, especially when the Commissioner makes the argument. *See, e.g.*, *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) ("When 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'" (quoting *Nat'l Labor Relations Bd. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *id.* (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.")).

Second, *Engel* and this case differ factually. In the face of significant evidence, the ALJ in *Engel* did not make a severity finding as to the plaintiff's alleged depression and PTSD, both of which were central to the plaintiff's underlying claim. *See Engel*, 2014 WL 1818187, at \*5.

9

The Court noted that "[t]he ALJ's failure to make a severity determination . . . leaves the Court unable to meaningfully review his decision." *Id.*  Here, by contrast, it is clear what the ALJ did because he gave great weight to both reviewers who diagnosed Plaintiff's BIF, and he incorporated their opinions as to Plaintiff's BIF-related limitations into his RFC analysis.  In addition, Plaintiff did not base his case for disability on his BIF in any meaningful way.  In fact, at the administrative hearing, Plaintiff's representative listed the impairments Plaintiff contended were severe and BIF was not among them.  (*See* Doc. 10 at Tr. 38, PAGEID #: 80 ("Your Honor, the severe impairments in this case are related to degenerative disc disease, he's had chronic lower back pain. . . .  He is also having some issues with anxiety and irritability and he is being treated at Woodland Centers.")).

Beyond *Engel*, the majority of case law in this Circuit supports the Commissioner.  In circumstances like the one here, we ask a practical question: whether the ALJ's RFC analysis "consider[s] *limitations and restrictions* imposed by all of an individual's impairments." *Mays v. Comm'r of Soc. Sec.*, No. 1:14-CV-647, 2015 WL 4755203, at *6 (S.D. Ohio Aug. 11, 2015) (emphasis added) (quoting Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *5), *report and recommendation adopted*, No. 1:14CV647, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015); *see Kohler v. Colvin*, No. 3:14CV00163, 2015 WL 3743285, at *4–5 (S.D. Ohio June 15, 2015) ("The question next becomes whether the ALJ *properly considered and accounted for any limitations* caused by Plaintiff's migraines throughout the rest of her decision." (emphasis added)), *report and recommendation adopted*, No. 3:14-CV-163, 2015 WL 4214469 (S.D. Ohio July 10, 2015); *see also Mays*, 2015 WL 4755203, at *6 (declining to engage in the harmless-error analysis only where the ALJ did not provide "*any discussion*" in the RFC analysis of the impairment at issue (emphasis added)).  Here, the answer to that question is yes.  The ALJ

10

considered the limitations and restrictions imposed by all of Plaintiff's impairments, which means the severity-determination error was harmless.

**B.     The ALJ's Failure to Consider Plaintiff's BIF at Step Three**

A claimant meets Listing 12.05C if three requirements apply: "(1) initial onset of subaverage general intellectual functioning and deficits in adaptive functioning prior to age 22; (2) a 'valid verbal, performance, or full scale IQ of 60 through 70;' and (3) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'" *Moses v. Comm'r of Soc. Sec.*, No. 1:12-CV-383, 2014 WL 359677, at *5 (E.D. Tenn. Feb. 3, 2014).  Plaintiff contends his IQ tests from his school-age days establish him as disabled under Listing 12.05C.  He argues the ALJ therefore erred by not considering whether his BIF qualified as an intellectual disability under Listing 12.05C.

The Court disagrees.  To be sure, the ALJ did not explicitly walk through each aspect of Listing 12.05C or make a specific finding as to 12.05C.  But substantial evidence supports the ALJ's decision that Plaintiff did not meet any of the Listing requirements, in particular as applied to Listing 12.05C.  In order to prevail as to 12.05C, Plaintiff had to show, among other things, he had a valid IQ score of 70 or below.  He did not do so.  The three IQ tests he took in school all came in *over* 70—in fourth grade (75), in sixth grade (78), and in 8th grade (81).  (*See, e.g.*, Doc. 10 at Tr. 357–66, PAGEID #: 399–408).  Plaintiff's argument as to 12.05C is therefore not well taken.  *See Kelly ex rel. M.L.K. v. Comm'r of Soc. Sec.*, No. 4:10-CV-976, 2011 WL 3236170, at *10 (N.D. Ohio July 28, 2011) ("[Plaintiff's] general intelligence quotient exceeded the scores necessary to meet any of the median scores necessary to show intellectual inability. The Magistrate finds that the ALJ did not err in failing to consider whether [Plaintiff's] impairments were consistent with the Listing 112.05 because there was no evidence satisfying the threshold

intelligence quotient necessary to meet subsection D of Listing 112.05.").

Even assuming the ALJ somehow erred by not spending more time to discuss the fact that Plaintiff clearly did not meet Listing 12.05C, reversal still would not be appropriate in this instance. *See, e.g.*, *Moses*, 2014 WL 359677, at *7 (holding that because claimant's "IQ scores of record are above the 60 to 70 range. . . . remanding this case to have the ALJ specifically discuss Listing 12.05C would serve no practical purpose, would not alter the ALJ's findings, and would be a waste of judicial and administrative resources"); *see also Fisher*, 869 F.2d at 1057 ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

Plaintiff also misses the mark with his related argument that the ALJ erred by not ordering follow-up standardized tests to assess his intellectual capacity. None of the evidence indicated that Plaintiff had an IQ within the range required to meet Listing 12.05C. On that fact alone the ALJ had enough information to make his decision. Further, the ALJ's analysis as to Plaintiff's RFC, which accounted for any of Plaintiff's documented mental limitations, was supported by substantial evidence—including by reports of Mr. Griffiths and Ms. Lewin. The ALJ thus did not need to require further testing. *See, e.g.*, *Torres v. Comm'r of Soc. Sec.*, No. 1:14-CV-1323, 2015 WL 5944100, at *3 (W.D. Mich. Oct. 13, 2015) ("[T]he ALJ is not required to supplement the record with additional evidence unless the record as it then exists is insufficient to assess Plaintiff's residual functional capacity or otherwise resolve her claims."); *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) ("The ALJ has discretion to determine whether additional evidence is necessary."); *see also Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 n.3 (6th Cir. 2009) ("[A]n ALJ is required to [supplement the record] only

when the information received is inadequate to reach a determination on claimant's disability status . . . .").

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of the Commissioner.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: June 23, 2016                              /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE